IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

KEON CORLEY,

    **Plaintiff,**

v.

WEFORD HEALTH SOURCES, INC.,
JOHN TROST, FE FUENTES, and
STEPHEN RITZ,

    **Defendants.**

Case No. 3:16-CV-850-NJR-GCS

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Plaintiff Keon Corley alleges that, after he broke his finger while he was incarcerated at Menard Correctional Center in March 2015, Defendants Wexford Health Sources Inc., John Trost, Fe Fuentes, and Stephen Ritz were deliberately indifferent to his serious medical needs in violation of his Eighth Amendment rights. Before the Court is a motion for summary judgment filed by Defendants (Doc. 92). For the reasons explained below, the Court grants in part and denies in part Defendants' motion.

### FACTUAL BACKGROUND

Three claims from Corley's Complaint, as identified in the Court's threshold order (Doc. 7), remain pending:

    **Count 5:**   Eighth Amendment deliberate indifference to serious medical need claim against Defendant Wexford Health Sources, Inc. for maintaining a policy that led to inadequate medical care, delayed medical care, improperly trained medical staff, lack of follow up care, and refusal of pain medication, with the objective of saving money;

**Count 10:** Eighth Amendment deliberate indifference claim against Defendant John Trost and Defendant Fe Fuentes, both doctors, for denying pain medication stronger than Motrin to treat Corley's injured hand; and

**Count 12:** Eighth Amendment deliberate indifference claim against Defendant Stephen Ritz, a doctor, for failing to allow adequate access to physical therapy via a cuff pass and for denying ongoing care recommended by an external provider.

Many of the facts underlying Corley's claims in this action are undisputed by the parties.

Corley has been an inmate in the custody of the Illinois Department of Corrections since 2005. At all times relevant to this action, he was incarcerated at Menard Correctional Center. Defendant Fe Fuentes worked as a physician at Menard Correctional Center from June 2008 through July 2015; she was an employee of Defendant Wexford Health Sources, Inc. Defendant John Trost was a physician employed by Wexford and worked as the Medical Director at Menard from November 2013 through March 2017. Defendant Stephen Ritz, a doctor, has been employed by Wexford as the Corporate Utilization Management Medical Director since September 2014.

On March 2, 2015, Corley visited the healthcare unit at Menard on a nurse sick call and was evaluated by Martha Oakley, a licensed practical nurse ("LPN"). He complained about right finger pain. On Corley's medical records, Oakley circled "MD referral." Defendants interpret this referral as one to a nurse practitioner or a medical doctor, but Corley maintains that he should have been referred to a medical doctor for evaluation. (Doc. 93, p. 3 at ¶ 6; Doc. 98, p. 2 at ¶ 6).

Corley was evaluated by a nurse practitioner on March 3, 2015, and he continued to complain of pain in his right ring finger. The nurse practitioner noted that Corley was

alert and oriented, that he did not display apparent distress, and that he had swelling and limited range of motion to the third, fourth, and fifth digits of his right hand. The nurse practitioner ordered an x-ray of Corley's right hand to rule out a fracture. The x-ray revealed a displaced fracture of the fourth proximal phalanx with associated soft tissue swelling.

Following the x-ray, the nurse practitioner admitted Corley to the healthcare unit, prescribed Motrin for his pain, and submitted an urgent request for collegial review, seeking to refer Corley for an orthopedic evaluation. The parties disagree as to the purpose of collegial review. Defendants describe it as a conference between physicians to evaluate treatment and recommendations, but Corley cites to Defendant Ritz's deposition to support his position that it is an opportunity to discuss cases with clinical staff at the facilities and to look at the medical necessity and general management of care that may have to be provided off-site. (Doc. 93, p. 4 at ¶ 9; Doc. 98., p. 2 at ¶ 9; Doc. 98-2). Dr. Ritz approved the nurse practitioner's request, and Corley was scheduled for an orthopedic evaluation on March 4, 2015.

Due to weather, Corley's evaluation was rescheduled to March 6, 2015, at the request of the orthopedic specialist, but he was seen by Defendant Fuentes that day before the appointment was canceled. She noted that his splint was intact and that he had good circulation to this injured finger. She examined him again on March 5, and Corley reported ongoing pain. Fuentes recommended that he continue his current plan of care. At 8:30 a.m. that day, Corley saw a nurse and told her that his hand hurt but that the Motrin helped. At 3:05 a.m. on March 6, 2015, Corley reported that he was in pain to a

nurse and asked specifically for Motrin, stating, "I would like some Motrin please." (Doc. 93-1, p. 12).

Dr. Bret Miller at the Orthopaedic Institute of Southern Illinois evaluated Corley's injury on March 6, 2015. He determined that Corley had a right ring finger proximal phalanx fracture. Dr. Miller recommended a closed reduction and percutaneous pinning of Corley's ring finger.

Corley returned to Menard after the appointment and was evaluated by a nurse. The nurse spoke with Defendant Trost about Dr. Miller's report. As the report did not contain any pain medication recommendations, Dr. Trost ordered that Corley continue with Motrin for pain, as previously prescribed. Dr. Ritz approved the surgery recommended by Dr. Miller on March 6, 2015. Corley was scheduled for surgery on March 9, 2015. In accordance with Dr. Miller's pre-surgical instructions, Dr. Trost ordered that Corley's Motrin be held for 72 hours prior to surgery.

Dr. Miller performed the surgery on Corley's finger on March 9, 2015. Corley returned to Menard after surgery and was evaluated by a nurse. The nurse reported on Corley's condition to Dr. Trost, who put in a telephone order for a Motrin prescription with instructions to schedule Corley for an evaluation with a doctor the following morning. Dr. Trost testified at this deposition that, in cases like Corley's, he would start out prescribing a non-narcotic pain medication, like Motrin, and see how a patient does. If the non-narcotic didn't work, then he would prescribe a stronger pain medication, like a narcotic, to attempt to control pain.

At her deposition Dr. Fuentes testified that she would have prescribed Tramadol instead of Motrin had she seen Corley when he returned from his surgery because of the amount of pain caused by the surgery. (Doc. 98-5, p. 12). Dr. Fuentes evaluated Corley on the morning of March 10, 2015, and he complained of continued right-hand pain. She examined his hand and prescribed Tramadol, an opiate, for two days. Dr. Fuentes chose to limit the prescription to 48 hours because the pain and swelling lessens after the first postoperative day. When the healthcare unit sees an inmate daily after surgery, the prescription can be extended, if needed, she explained. (Doc. 98-5, p. 12).

Dr. Fuentes saw Corley again on March 11, 2015, and recommended that he continue with the current course of treatment. Dr. Trost also submitted a request for collegial review that day, and Corley was approved for a post-operative follow-up with Dr. Miller, which was scheduled for March 19, 2015. Dr. Fuentes examined Corley again on March 12, 2015. She ordered that his status be changed to "chronic" so that he would not be charged further for pain medication. She renewed Corley's Motrin prescription on March 13, 2015, and evaluated him again on March 18, 2015. Corley reported no complaints during that visit, and Dr. Fuentes recommended that he be released from the infirmary and placed on a security hold, which allowed him to stay in the healthcare unit for safety reasons due to his inability to use his right hand.

Corley went to his follow-up appointment with Dr. Miller on March 19, 2015. He reported that he was doing well post-surgery and that he had very little discomfort and no complaints. Dr. Miller recommended that Corley follow-up in two weeks for x-rays of his right hand.

On April 13, 2015, Corley reported swelling and pain in his right hand after striking it on a wall on April 7, 2015. Dr. Fuentes ordered, by telephone, that an updated x-ray of Corley's hand be taken. An x-ray taken the next day showed two metallic pins across a fracture with satisfactory bony alignment. On April 16, 2015, Corley's follow-up with Dr. Miller, which was supposed to happen within two weeks of their March 19 appointment, was scheduled for April 22, 2015.

The paperwork with the request for the follow-up appointment did not make it back to Menard with Corley on March 19, 2015. Defendants submit that a medical furlough clerk, and not Dr. Ritz, Dr. Trost, or Dr. Fuentes, is responsible for scheduling off-site follow-up appointments for inmates at Menard. Corley points out that Dr. Ritz testified that Wexford is partly responsible for facilitating off-site inmate medical appointments. (Doc. 93, p. 9 at ¶ 30; Doc. 98, p. 3 at ¶ 30). The medical furlough clerk eventually followed-up on the missing paperwork. By the time a second copy was received, it was outside the recommended two-week window, and Corley was scheduled for the next available appointment with Dr. Miller.

Corley was examined by Dr. Miller on April 22, 2015. Dr. Miller noted that Corley's joint was very tight and that his pinky and middle fingers were both stiff. Corley reported numbness and decreased sensation, but Dr. Miller wrote that it could have been caused by drying of the skin. He expressed that the delay in the scheduling of his follow-up appointment caused issues because Corley needed to be moving his finger earlier. Dr. Miller noted that the fracture showed "really very little, if any, healing in that bone at this

point," and that he felt "that we [don't] have any option but to go ahead and proceed with physical therapy or OT for this hand." (Doc. 93-1, p. 37-38).

After the follow-up appointment with Dr. Miller, Dr. Trost submitted a request for collegial review to refer Corley for a follow-up with Dr. Miller and for occupational therapy, and Dr. Fuentes reviewed his chart on April 24 and renewed Corley's prescription for Motrin. On April 27, 2015, Dr. Ritz approved the request and referred Corley for one off-site occupational therapy evaluation and for a follow-up appointment with Dr. Miller. (Doc. 98-1, p. 102).

Corley was evaluated by a therapist on May 5, 2015, and he was instructed on a home exercise program to improve range of motion in his fingers. Corley testified that the physical therapist told him he needed physical therapy appointments two or three times per week, in addition to his home plan, in order to regain full mobility. (Doc. 98-6, p. 10). Corley also had an appointment with Dr. Miller on May 5, 2015. He told Dr. Miller that he had continued, but less severe, pain and that his range of motion had improved somewhat. Dr. Miller recommended that Corley continue with his range of motion exercises and that he return for a follow-up appointment in two-to-three weeks.

Dr. Trost evaluated Corley's recovery during an appointment on June 2, 2015. Corley reported no complaints during the visit, and Dr. Trost submitted a request for collegial review to refer Corley for his follow-up visit with Dr. Miller. Corley saw Dr. Miller on June 4, 2015. He told Dr. Corley that he had no complaints and that he was feeling better, with improved range of motion and decreased pain. Dr. Miller found that

Corley's fracture was healing and improved. He recommended that Corley return in four weeks for x-rays to ensure that the fracture had healed completely.

Dr. Trost submitted a request for collegial review to refer Corley for the follow-up appointment with Miller. Dr. Trost and Dr. Ritz discussed the request on June 12, 2015. Dr. Ritz did not approve the request because the x-ray could be performed at Menard. Dr. Ritz instead recommended an alternative treatment plan, which recommended on-site x-rays after which Dr. Trost could re-present the request for a referral to Dr. Miller.

On July 9, 2015, Dr. Trost evaluated Corley and ordered an x-ray, following Dr. Ritz's alternative plan. Corley was scheduled for an x-ray on July 10, 2015, but it was canceled due to a lockdown at Menard. The x-ray was scheduled for July 17, 2015, but it had to be canceled again due to another lockdown. The x-ray was completed on July 21, 2015, and it showed an essentially completely healed fracture. Dr. Trost resubmitted the request to refer Corley for a follow-up appointment with Dr. Miller. Dr. Ritz denied the request because the x-ray showed an essentially completely healed fracture. Dr. Ritz instead recommended an alternative treatment plan that included continued on-site monitoring.

The next x-ray, which was performed at Menard on September 1, 2015, showed that Corley's right ring-finger fracture was healed. Corley, however, testified that he has continued pain, which precludes him from seeking certain jobs at Menard, like janitorial work, because he cannot do heavy lifting. He also explained that he cannot lift weights like he used to because he has grip issues, and he cannot write long letters without experiencing excessive throbbing. (Doc. 98-6, p. 15).

## LEGAL STANDARDS

### I. Summary Judgment Standard

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *Archdiocese of Milwaukee v. Doe,* 743 F.3d 1101, 1105 (7th Cir. 2014), *citing* FED. R. CIV. P. 56(a). *Accord Anderson v. Donahoe,* 699 F.3d 989, 994 (7th Cir. 2012). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enterpr., Inc.,* 753 F.3d 676, 681-82 (7th Cir. 2014).

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012); *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542 (7th Cir. 2014).

### II. Eight Amendment Deliberate Indifference

The Eighth Amendment prohibits cruel and unusual punishment, and the deliberate indifference to the "serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez v.*

*Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009). A prisoner is entitled to "reasonable measures to meet a substantial risk of serious harm"—not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). A prisoner's dissatisfaction with a medical professional's prescribed course of treatment does not give rise to a successful deliberate indifference claim unless the treatment is so "blatantly inappropriate a to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)(quoting *Thomas v. Pate*, 493 F.2d 151, 158 (7th Cir. 1974)).

In order to prevail on a claim of deliberate indifference, a prisoner who brings an Eighth Amendment challenge of constitutionally-deficient medical care must satisfy a two-part test. *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (citing *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006)). The first consideration is whether the prisoner has an "objectively serious medical condition." *Arnett*, 658 F.3d at 750. *Accord Greeno*, 414 F.3d at 653. "A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Hammond v. Rector*, 123 F. Supp. 3d 1076, 1084 (S.D. Ill. 2015) (citing *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir.2014)). It is not necessary for such a medical condition to "be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). *Accord Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (violating the Eighth Amendment requires "deliberate indifference to a *substantial* risk of *serious* harm") ((internal quotation marks omitted) (emphasis added).

Prevailing on the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *Id.* at 653. The plaintiff need not show the individual "literally ignored" his complaint, but that the individual was aware of the condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). "Something more than negligence or even malpractice is required" to prove deliberate indifference. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *see also Hammond v. Rector*, 123 F. Supp. 3d 1076, 1086 (S.D. Ill. 2015) ("isolated occurrences of deficient medical treatment are generally insufficient to establish . . . deliberate indifference"). Deliberate indifference involves "intentional or reckless conduct, not mere negligence." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010)(citing *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).

Assessing the subjective prong is more difficult in cases alleging inadequate care as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). The Seventh Circuit has explained:

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Id.* (citing *Zaya v. Sood*, 836 F.3d 800, 805-06 (7th Cir. 2016)). This is in contrast to a case "where evidence exists that the defendant [ ] knew better than to make the medical decision[ ] that [he] did," *Id.* (quoting *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir.

2016))(alterations in original). A medical professional's choice of an easier, less efficacious treatment can rise to the level of violating the Eighth Amendment, however, where the treatment is known to be ineffective but is chosen anyway. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010).

## ANALYSIS

### I. Count 5: Deliberate Indifference claim against Defendant Wexford Health Sources, Inc.

Typically, the doctrine of *respondeat superior* does not apply in Section 1983 cases. *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014) (citing *Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982)). In *Monell v. Dep't of Social Services of the City of New York*, however, the Supreme Court held that a municipality may be liable under Section 1983 for constitutional violations resulting from a policy or custom of the municipality. 436 U.S. 658, 690–91 (1978). The Seventh Circuit has extended *Monell* beyond municipalities to include private corporations providing government services, such as Wexford. *See Shields*, 746 F.3d at 789. Absent a deprivation of a constitutional right, a claim under *Monell* cannot succeed. *Rice v. Correctional Medical Services*, 675 F.3d 650, 675 (7th Cir. 2012).

Liability under *Monell* may be established in three ways. First, a plaintiff may establish that the unconstitutional action "'implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017)(quoting *Los Angeles County v. Humphries*, 562 U.S. 29, 35 (2010)). Second, the plaintiff might prove that

a custom was created by "'those whose edicts or acts may fairly be said to represent official policy.'" *Glisson*, 849 F.3d at 379 (quoting *Monell*, 436 U.S. at 690–91).

The final way a plaintiff may demonstrate liability pursuant to *Monell* is by establishing a widespread custom. *Glisson*, 849 F.3d at 379. Liability may extend to customs "so permanent and well settled as to constitute a custom or usage with the force of law" even though they received no formal approval. *Monell*, 436 U.S. at 91 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)). A widespread custom may be established by evidence of policymaking officials' knowledge and acquiescence to the unconstitutional practice. *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 511 (7th Cir. 1993). Sufficient evidence may include proof that the practice was so "long standing or widespread" that it would "support the inference that policymaking officials 'must have known about it but failed to stop it.'" *Id.* (quoting *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991)).

The "critical question under *Monell* … is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it) or if instead the harm resulted from the acts of the entity's agents." *Glisson*, 849 F.3d at 379 (internal citation omitted). Corley does not point to a policy statement, regulation, or decision that has been officially adopted and promulgated by officials at Wexford that caused a delay or other issues in his treatment. Similarly, he does not describe a specific policy, practice, or custom by Wexford that is constitutionally suspect. While it is unclear which conduct by Wexford during his course of treatment he alleges constitutes a harmful custom or practice, Corley appears to argue that Defendants Fuentes, Trost, and Ritz had final policymaking

authority and created an unspecified custom through their edicts and acts that led to deliberate indifference on the part of Wexford.

The Seventh Circuit differentiates between a final decision-maker and a final policymaker when it comes to actions by a doctor during a prisoner's medical care. *See Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016). A doctor who has the final say on a prisoner's treatment plan is a final decision-maker with respect to his care, but that is insufficient to show that he was a final policymaker. *Id.* Having discretion for some decisions does not make an individual "responsible for establishing final … policy on a particular issue." *Valentino v. Vill. S. Chi. Heights*, 575 F.3d 664, 675 (7th Cir. 2009).

Corley does not provide sufficient evidence that Defendants Fuentes, Trost, and Ritz had final policymaking authority for Wexford. Defendants Fuentes and Trost, in particular, did not have final decision-making authority, as their requests for outside referrals had to be submitted for review. Defendant Ritz had greater decision-making authority with respect to Corley's care, but Corley does not provide sufficient evidence or a developed argument to establish that Dr. Ritz was a person whose edicts and acts constituted official Wexford policy. Given the lack of argument and evidence to establish that a policy, practice, or custom of Wexford's caused Corley harm, Defendant Wexford Health Sources, Inc. is entitled to summary judgment on Count 5.

II. **Count 10: Deliberate Indifference claims against Defendants Fe Fuentes and John Trost**

There is insufficient evidence to allow a reasonable juror to conclude that

Defendant Fuentes was deliberately indifferent to Corley's hand injury and his related pain. There is no evidence that she knowingly or recklessly disregarded his injury. Dr. Fuentes saw Corley and evaluated his injury on March 4 and 5, 2015, before his evaluation by Dr. Miller. Between March 5 and Corley's surgery on March 9, 2015, he saw other members of the healthcare unit staff and reported that the Motrin was helping with his pain. While he testified that he told members of the healthcare unit that he wanted something stronger that Motrin for his pain, there is no evidence of that in his medical records, nor did he express that to a physician. (*See* Doc. 98-6, p. 16-17).

Dr. Fuentes saw Corley on March 10, 2015, the morning after his surgery, and, recognizing that he was in greater pain following surgery, she prescribed a stronger pain medication for two days. When she saw him the next day, he reported no complaints. While he reported having occasional right-hand pain on March 12, Dr. Fuentes determined that Corley's Motrin prescription should be renewed on March 13, 2015. By the time she saw him again on March 18, Corley again reported no complaints.

There is no evidence in the record that Corley's alleged request for stronger pain medication, if made, reached Dr. Fuentes and that she knowingly or recklessly disregarded his medical needs. While Corley characterized his pain as excruciating when he described it during his deposition, there is insufficient evidence that he told Defendant Fuentes he was in excruciating pain and that, knowing of his pain, she declined to provide reasonable treatment. As such, she is entitled to summary judgment.

Corley argues that Dr. Trost also was deliberately indifferent to his pain post-surgery, pointing to a medication reconciliation form that shows that a Norco

prescription was destroyed "per RN request." (Doc. 98-1, p. 95-96). The form suggests that Dr. Miller prescribed Norco, but a nurse at Menard directed that the prescription be destroyed, as Corley would "only" receive Motrin. It is unclear whether that decision was made at Dr. Trost's direction, and Corley also points to a statement by Dr. Fuentes that she would have prescribed a narcotic and not Motrin after his hand surgery as evidence of Dr. Trost's deliberate indifference to Corley's pain.

Dr. Trost described his more conservative approach of trying non-narcotic pain medications first, which is not the approach that Dr. Miller or Dr. Fuentes may have chosen. The Seventh Circuit, however, has held that "evidence that another doctor would have followed a different course of treatment is insufficient to sustain a deliberate indifference claim." *Burton v. Downey*, 805 F.3d 776, 787 (7th Cir. 2015). To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* (quoting *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008)).

In *Burton*, the Seventh Circuit found that the medical staff treating a pretrial detainee was not deliberately indifferent when they ignored the detainee's preference for a narcotic pain medication, even when he displayed withdrawal symptoms and suffered extreme post-surgical pain. *Id.* Preference of one pain medication over another does not give rise to a deliberate indifference claim, as prisoners "are not entitled to receive 'unqualified access to healthcare.'" *Id.* (citing *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). With no evidence to allow a reasonable juror to discredit Dr. Trost's claim that he was

taking a conservative approach to pain management, rather than intentionally or recklessly disregarding Corley's post-surgery pain, he is entitled to summary judgment.

### III. Count 12: Deliberate Indifference claim against Defendant Stephen Ritz

The parties' disputes as to Count 12 focus on two issues: Corley's post-surgery occupational therapy and Dr. Ritz's denial of the final two requests to refer Corley for a follow-up appointment with Dr. Miller. As to Corley's physical therapy, Dr. Ritz approved a single outpatient appointment along with a home exercise plan. Corley claims that he was told during his physical therapy appointment that he needed regular outpatient appointments in addition to his home exercise plan.

Dr. Ritz, however, testified patients requiring physical therapy are sent out for an evaluation and for a home health exercise program because it is not feasible to send inmates for multiple off-site physical or occupational therapy sessions due to security, transportation, and public safety concerns. He pointed to on-site medical staff as being available to monitor and support patients with home exercise programs. (Doc. 93-4, p. 13). Similarly, the decision not to send Corley back for follow-up appointments with Dr. Miller after his fracture was close to being healed was based on the availability of in-house medical staff to perform and review the needed x-ray. Corley maintains that he has ongoing pain and soreness in his finger and that he cannot write for long periods of time without pain due, in part, to these decisions.

Refusals to refer an inmate for medical care can create a question of material fact as to whether a doctor was deliberately indifferent. *See, e.g., Green v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005) (finding that a reasonable juror could conclude that a doctor who

refused to refer an inmate to a specialist over a two-year period was deliberately indifferent). While prisoners are entitled only to adequate care, a reasonable juror could conclude that Corley did not receive adequate care given his ongoing symptoms and the complications that Dr. Miller indicated were caused by the delay in his follow-up appointment in April 2015. There is a question of fact as to whether Dr. Ritz's determinations were made for reasons other than his professional judgment as to the appropriate treatment. If he chose a less efficacious court of treatment, such as a home exercise program when outpatient therapy was needed in light of Corley's delayed healing, and Corley suffered pain as a result, then the Eighth Amendment could be triggered. *See Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999). As such, Defendant Ritz is not entitled to summary judgment.

## CONCLUSION

For these reasons, the Court **GRANTS in part and DENIES in part** Defendants' motion for summary judgment (Doc. 92). At the close of the case, the Clerk of Court shall enter judgment in favor of Defendant Wexford Health Sources, Inc., Defendant Fe Fuentes, and Defendant John Trost and against Plaintiff Keon Corley.

Count 12 against Defendant Stephen Ritz remains pending. Judge Sison is **DIRECTED** to set this case for a settlement conference.

**IT IS SO ORDERED.**

DATED: September 24, 2019

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**